IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON C. CHANG, M.D.<br><br>           Plaintiff,<br><br>   vs.<br><br>THE REHABILITATION HOSPITAL OF THE PACIFIC; TIMOTHY J. ROE, M.D.; STEPHEN M. OISHI, M.D.; JANE and/or JOHN DOES 1-25, and DOE ENTITIES 1-10,<br><br>          Defendants. | CIV. NO. 19-00383 JMS-KJM<br><br>AMENDED ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION, ECF NO. 3 |

## AMENDED ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION, ECF NO. 3

## I. <u>INTRODUCTION</u>

On July 16, 2019, Plaintiff Jason C. Chang, M.D. ("Chang"), filed a

Complaint for Declaratory and Injunctive Relief against Defendants the

Rehabilitation Hospital of the Pacific (the "Hospital"), Timothy J. Roe, M.D.

("Roe") and Stephen M. Oishi, M.D. ("Oishi") (collectively, "Defendants"),

arising from the summary suspension of Chang's medical staff privileges at the

Hospital. ECF No. 1. The Complaint alleges violations of federal and state

constitutional due process rights, federal and state law, and the Hospital's bylaws.

*See id.*

Currently before the court is Chang's Motion for Preliminary Injunction (the "Motion"). ECF No. 3. The Motion seeks an order enjoining Defendants from summarily suspending Chang's medical staff privileges at the Hospital[1] and from reporting Chang's summary suspension to the National Practitioners Data Bank ("NPDB"). *See id.* Based on the following, the court DENIES the Motion.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**[2]

As of early 2019, Chang, a physician, was employed as the Chief Medical Officer at the Hospital. He was also a member of the Hospital's medical staff with privileges at the Hospital, which meant that Chang could see his own patients at the Hospital separate from his Hospital employment. The Medical Executive Committee ("MEC") governs the medical staff at the Hospital, including conducting peer review of medical staff members.

---

[1]  At the July 29, 2019 hearing, Chang withdrew his request to lift the summary suspension. He now only seeks to enjoin the Hospital from reporting to the NPDB. But, to address Chang's request to enjoin the Hospital from reporting to the NPDB, the court must also address the appropriateness of Chang's summary suspension.

[2]  These facts are based on Defendant's Statement of Facts, ECF No. 26, and attached declarations and exhibits.

### 1.    *The Medical Staff Bylaws*

As a member of the Hospital's medical staff, Chang agreed to be bound by the Medical Staff Bylaws.

### a.    *Investigations*

The Medical Staff Bylaws provide that an investigation must be initiated when "reliable information indicates a member may have exhibited acts, demeanor, or conduct reasonably likely to be: 1) detrimental to patient safety or to the delivery of quality patient care within the Hospital; 2) unethical; 3) contrary to the Medical Staff bylaws, rules, and/or policies and procedures." Medical Staff Bylaws ¶ 8.2.1. But, "[d]espite the status of any investigation, *at all times the [MEC] retains its authority and discretion to take whatever actions may be warranted by the circumstances including summary suspension . . . ." Id.* ¶ 8.2.3 (emphasis added).

Upon completion of the investigation, a report must be provided to the MEC. *Id.* ¶ 8.2.3. "If corrective action is being contemplated, the member shall be notified in writing by the [MEC] or its designee that an investigation is being conducted, and the member shall be given an opportunity to provide information in a manner and upon such terms, as the investigating panel deems appropriate." *Id.* After conclusion of the investigation, the MEC may recommend (among other

options) suspension of clinical privileges and medical staff membership. *Id.*

¶ 8.2.4. If suspension is recommended, then the practitioner is entitled to

procedural rights, and the practitioner must be given notice of the adverse

recommendation and of the right to a formal hearing. *Id.* ¶ 8.2.6.

        *b.*    *Summary suspension*

The Medical Staff Bylaws provide that, at any time (even prior to the

completion of an investigation), the MEC may "summarily suspend the Medical

Staff member of all or any portion of the clinical privileges of such practitioner" if

"a practitioner's conduct violates these Bylaws or other hospital policies or

whenever conduct requires immediate action to be taken to reduce a substantial

likelihood of imminent danger to the health or safety of any patient, employee or

other person present in the Hospital." *Id.* ¶ 8.3.1. "The practitioner has a right to

attend the meeting and make a statement on such terms and conditions of the

summary suspension as the [MEC] may impose." *Id.* But that meeting does not

constitute a hearing with procedural protections. *Id.*

After the summary suspension becomes effective, the practitioner

must be notified that he or she has a right to MEC review as described above, with

the additional requirements that the corrective action investigation must be

completed within thirty days, and a hearing must be commenced within sixty days

after the practitioner requests it. *Id.*

### 2. *Disruptive Practitioners Policy*

The MEC adopted a Disruptive Practitioners Policy, which provides

that:

> When a practitioner's conduct disrupts the operation of
> the hospital, affects the ability of others to get their jobs
> done, creates a "hostile work environment" for hospital
> employees or other practitioners on the medical staff, or
> begins to interfere with the practitioner's own ability to
> practice competently, action must be taken.
>
> Disruptive behaviors, depending on the nature and
> severity, may require immediate action, including
> summary suspension.
>
> All credentialed providers will be managed through the
> Medical Staff Bylaws and Policies. . . .

Disruptive Practitioners Policy, Section I. Policy.

### 3. *The Allegations and the Hospital's Subsequent Actions*

In March 2019, two Hospital employees brought complaints against

Chang to Human Resources. Neither of these employees were physicians. Those

employees worked in a department at the Hospital (the "Department").[3] Employee

---

[3] To protect the privacy of the employees that brought the allegations, the court will not
identify the name of the Hospital department or the names of the employees.

#1 alleged that Chang engaged in inappropriate conduct towards her and Employee #2. Employee #2 filed her own complaint, which alleged that Chang engaged in sexual harassment against her. Within a few weeks of making the allegations, both employees were put on administrative leave. In late-March, the Hospital hired Susan Ichinose ("Ichinose"), a Honolulu attorney, to conduct an independent investigation of the allegations. The Department was closed on April 15, 2019 because a temporary replacement could not be found for Employee #2—she was still on administrative leave and had specialized training essential to running the Department.

On April 25, 2019, Oishi, President of the MEC, notified Chang that he was placed on restrictions and directives pursuant to the Medical Staff Bylaws based on the allegations. On May 3, 2019, Chang was notified that he had violated those restrictions and directives. On May 10, 2019, Ichinose interviewed Chang with his attorney present.[4] On May 24, 2019, the MEC unanimously approved the appointment of an Ad Hoc Committee for the purpose of considering the allegations and determining if corrective action was required.

---

[4] There is some evidence showing that Chang avoided interviewing with Ichinose on several occasions, including by providing a false excuse.

On May 28, 2019, Ichinose completed her investigation and submitted her executive summary and final investigation report to the Hospital.  She found that Chang created a hostile work environment for both employees, and that as to Employee #2, Chang "engaged in hostile environment sexual harassment." Regarding the sexual harassment, Ichinose found it more likely than not that: (1) Chang subjected Employee #2 to sexual activity without actual consent; (2) that sexual activity was unwelcome and imposed by Chang; (3) Employee #2 was intimidated and coerced by Chang; and (4) the sexual activity included, among other things, Chang's penis penetrating Employee #2's vagina.

On June 5, 2019, Oishi informed Chang: (1) of the appointment of the Ad Hoc Committee and its purpose; (2) that the Ad Hoc Committee had a copy of the investigative report; and (3) that Chang may provide the Ad Hoc Committee with a written statement with other information he wished to be considered.  Then, on June 10, 2019, Roe, President and Chief Executive of the Hospital, notified Chang: (1) of the independent investigation's findings; (2) that his employment

with the Hospital was terminated; and (3) that Chang's privileges were being reviewed by the MEC, who had access to the investigative report.[5]

On June 11, 2019, the President of the MEC notified Chang that his medical staff privileges at the Hospital were summarily suspended, and that the Ad Hoc Committee would vote on June 13, 2019 whether to extend that suspension. Chang, through his attorney, submitted a written statement to the Ad Hoc Committee on June 12, 2019. The next day, the Ad Hoc Committee voted unanimously to extend the summary suspension. On June 14, 2019, the Ad Hoc Committee notified Chang of its decision and that Chang had a right to a formal hearing if he requested one. On July 8, 2019, Chang, through a new attorney, requested a formal hearing, presently scheduled for August 19, 2019. Prior to that hearing, the Hospital intends to report the summary suspension to the NPDB.

## B.    Procedural History

On July 16, 2019, Chang filed his Complaint for Declaratory and Injunctive Relief. ECF No. 1. On the same day, Chang also filed his Motion for Preliminary Injunction. ECF No. 3. A status conference was held on July 17, 2019. ECF No. 17. As directed by the court, the Hospital submitted a letter the

---

[5] Termination of his employment did not stop Chang from seeing his own patients at the Hospital using his medical staff privileges. Only summary suspension of his privileges by the MEC would prevent Chang from doing so.

next day.  ECF No. 18.  Another status conference was held on July 19, 2019.

ECF No. 19.  As directed by the court, Chang submitted a letter on July 22, 2019.

ECF No. 20.  Defendants filed their Opposition on July 24, 2019.  ECF No. 22.

Chang filed a Reply on July 26, 2019.  ECF No. 23.

A hearing was held on the Motion on July 29, 2019.  Both parties

were given an opportunity to call witnesses but declined.

### III.  <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy never awarded

as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation

omitted).  It "should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012)

(internal quotation marks, emphasis, and citations omitted).

To obtain a preliminary injunction, a plaintiff "must establish that

[plaintiff] is likely to succeed on the merits, that [plaintiff] is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities

tips in [plaintiff's] favor, and that an injunction is in the public interest."  *Winter*,

555 U.S. at 20.  As to the first factor, "if a plaintiff can only show that there are

'serious questions going to the merits'—a lesser showing than likelihood of

success on the merits—then a preliminary injunction may still issue if the 'balance

of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)); *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (reiterating the lesser "serious questions going to the merits" analysis). "The elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. All four elements must be established. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

## IV. <u>DISCUSSION</u>

Chang moves for an order enjoining and restraining Defendants from reporting Chang's summary suspension to the NPDB. ECF No. 3 at PageID #15. Accordingly, the court analyzes whether Chang has met his burden to satisfy all four *Winter* factors, and finds that Chang has not.

### A. Likelihood of Success on the Merits

The Complaint brings two causes of action arising from Defendants' summary suspension of Chang and upcoming reporting of that suspension to the NPDB: (1) violation of Plaintiff's rights to due process of law under the United States and Hawaii Constitutions; and (2) violation of Chang's "contractual rights to

due process" based on violation of the Hospital's bylaws. *See* ECF No. 1 at PageID #6-7. Neither cause of action has a likelihood of success on the merits.

## 1. *Violation of Constitutional Due Process*

Assuming that Chang has a property interest in his medical staff privileges that triggers constitutional due process protections, *see Russo v. Jones*, 2010 WL 3834965, at *11 (D. Haw. Sept. 24, 2010) (finding that "the state-recognized property interest in hospital privileges extends to all hospitals in the state"), the court must determine whether Chang "received an adequate procedural hearing before his property interest was terminated." *Lew v. Kona Hosp.*, 754 F.2d 1420, 1424 (9th Cir. 1985). This determination involves balancing Chang's "interests in pursuing his profession and in maintaining his income and professional reputation against the hospital's interests in maintaining the quality of its services and in being able to deal quickly and inexpensively with personnel matters." *Id.* (citations omitted). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (citation omitted).

### a. *The Heath Care Quality Improvement Act*

The Heath Care Quality Improvement Act (the "HCQIA"), 42 U.S.C. §§ 11101, *et seq.*, was enacted by Congress to address the "national need to restrict

the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" through the remedy of "effective professional peer review." 42 U.S.C. § 11101.  Because physicians were deterred from participating in such peer review because of potential liability, the HCQIA provided immunity to those physicians from damage suits.  *See* 42 U.S.C. § 11111(a)(1).  But that immunity was conditioned on adequate due process as set forth in 42 U.S.C. § 11112(a).  *See id.*  An immediate suspension of clinical privileges (without first conducting a formal hearing), is allowed, "subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual."  42 U.S.C. § 11112(c)(2).

The HCQIA also included a reporting requirement and provided immunity from liability for reporting.  *See* 42 U.S.C. §§ 11133(a), 11137(c).  Thus, "[e]ach health care entity which . . . takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . shall report to the Board of Medical Examiners . . . ."  42 U.S.C. § 11133(a)(1)(A).

The HCQIA directed the U.S. Secretary of Health and Human Services to issue regulations concerning "disclosure of the information" reported

and "procedures in the case of disputed accuracy of [that] information." 42 U.S.C. § 11136. And those regulations require: "[a]ny professional review action that adversely affects the clinical privileges of a physician . . . for a period longer than 30 days" to be reported by health care entities to the NPDB. 45 C.F.R. § 60.12.[6]

### b.    Summary suspension

Chang does not appear to challenge the constitutionality of the HCQIA itself. Rather, he claims that the Hospital did not meet HCQIA requirements to issue a summary suspension prior to a formal hearing because his conduct did not harm a particular patient or place any patient at risk of imminent harm. *See* ECF No. 23 at PageID #141. Also, he asserts that (1) the facts brought against him are disputed; (2) his alleged misconduct was against just one employee

---

[6] The NPDB Guidelines provide that:

> Matters not related to the *professional competence or professional conduct* of a practitioner should not be reported to the NPDB. For example, adverse actions based primarily on a practitioner's advertising practices, fee structure, salary arrangement, affiliation with other associations or health care professionals, or other competitive acts intended to solicit or retain business are excluded from NPDB reporting requirements.

ECF No. 18-2 at PageID #98 (emphasis added). The NPDB Guidelines also provide that "[g]enerally, the entity that takes the clinical privileges action determines whether the physician's . . . professional competence or professional conduct adversely affects, or could adversely affect, *the health or welfare of a patient*." *Id.* (emphasis added). Finally, the NPDB Guidelines explain that "[a] summary suspension is often imposed by an official (for instance, the chairman of a department) on behalf of the hospital or health care entity *for the purpose of protecting patients from imminent danger*." *Id.* at PageID #101 (emphasis added).

and her credibility is "subject to question"; and (3) there are no allegations of unprofessional or disruptive behavior toward Chang's "professional or staff colleagues at the hospital." *Id.* at PageID #142.

As an initial matter, "the statute does not require imminent danger to exist before a summary restraint is imposed," but rather "that the danger *may* result if the restraint is not imposed." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1443 (9th Cir. 1994), *overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001); *see also Lee v. Trinity Lutheran Hosp.*, 408 F.3d 1064, 1072 (8th Cir. 2005); *Isaiah v. WHMS Braddock Hosp. Corp.*, 2008 WL 2952765, at *14 (D. Md. July 25, 2008), *aff'd sub nom. Isaiah v. WMHS Braddock Hosp. Corp.*, 343 F. App'x 931 (4th Cir. 2009); *Schindler v. Marshfield Clinic*, 2006 WL 2944703, at *13 (W.D. Wis. Oct. 12, 2006).

And, "'[q]uality health care' is not limited to clinical competence, but includes matters of general behavior and ethical conduct." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003) (citing cases). Disruptive behavior can "endanger[] the hospital's ability to provide quality medical care." *Everhart v. Jefferson Par. Hosp. Dist. No. 2*, 757 F.2d 1567, 1573 (5th Cir. 1985); *see also Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318,

1334 (11th Cir. 1994) (concluding that the defendant-hospital was entitled to immunity from damages liability pursuant to the HCQIA, in a case involving a physician's disruptive behavior); *Mahmoodian v. United Hosp. Ctr., Inc.*, 404 S.E.2d 750, 759-61 (W. Va. 1991) (discussing the adverse impact on overall patient care that results from a physician's disruptive conduct) (citing cases).[7]

Among other things, the Hospital's independent investigator found it more likely than not that Employee #2, who was Chang's subordinate, was subjected to sexual activity by Chang without her actual consent—including, Chang penetrating her vagina with his penis. The investigator found it more likely than not that the sexual activity was unwelcome and imposed on Employee #2, and that she was intimidated and coerced by Chang. According to the investigator, this sexual activity occurred on the Hospital's premises. Based on a review of these findings, the MEC President, and later the Ad Hoc Committee, summarily suspended Chang.

From these facts, a fair inference is easily drawn—subjecting Employee #2 to unwelcome sexual activities at the Hospital without her actual

---

[7] Other physicians have been summarily suspended for sexual misconduct, and those suspensions have been upheld by that hospital's MEC and board after formal hearings were conducted. *See, e.g.*, *Tshibaka v. Sernulka*, 673 F. App'x 272, 275 (4th Cir. 2016); *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 170 (4th Cir. 2009).

consent may jeopardize medical care to patients in the Hospital. This is particularly true because Chang was the Hospital's Chief Medical Officer—a powerful position at the Hospital. And by jeopardizing medical care to patients, an imminent danger to the health of those patients follows. And, in fact, because Employee #2 was put on administrative leave (as a result of Chang's alleged sexual harassment), the Department had to close. Further, Chang may subject other staff members to non-consensual sexual activities, which could further jeopardize care to patients in the Hospital.

Thus, the summary suspension under the HCQIA was warranted under the circumstances presented here. Further, it appears that the Hospital otherwise followed proper procedures under the HCQIA, in that the Hospital was required to provide "subsequent notice and hearing or other adequate procedures." 42 U.S.C. § 11112(c)(2). The Hospital has provided notice and has scheduled a formal hearing for August 19, 2019.

Accordingly, Chang has a low likelihood of success on the merits regarding the summary suspension.

c.    *Reporting to the NPDB*

Chang argues that "the suspension itself was unwarranted . . . . [and] in the absence of a proper basis for summary suspension, a NPDB report is not

appropriate or required." ECF No. 20 at Page ID #107. Because the court has found that the summary suspension was proper, it appears that the court need not further analyze whether the Hospital should report the summary suspension to the NPDB. But, to the extent that Chang is arguing that this type of summary suspension is not the type necessitating a report to the NPDB, the court disagrees.

By reporting Chang's summary suspension, the Hospital is following proper (and required) reporting procedures as outlined in the HCQIA. *See* 42 U.S.C. § 11133(a)(1)(A) ("Each health care entity which . . . takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . *shall* report to the Board of Medical Examiners . . . .") (emphasis added).

To the extent that the NPDB Guidelines indicate that some adverse actions need not be reported, *see* ECF No. 18-2 at PageID #98, this is the type of adverse action that the Hospital would be required to report. The NPDB Guidelines provide that, "[m]atters not related to the professional competence or professional conduct of a practitioner should not be reported to the NPDB" and gives several examples of such matters: "adverse actions based primarily on a practitioner's advertising practices, fee structure, salary arrangement, affiliation with other associations or health care professionals, or other competitive acts

17

intended to solicit or retain business are excluded from NPDB reporting requirements." *Id.*; *see also Moore*, 560 F.3d at 170 n.1. In contrast, this matter (sexual harassment of a subordinate employee at a hospital) is clearly directly related to the professional conduct of a practitioner. *See, e.g.*, *Leal v. Sec'y*, 2009 WL 2985681, at *2-3 (M.D. Fla. Sept. 15, 2009) (affirming finding that a summary suspension, which was based on disruptive behavior, was reportable to the NPDB), *aff'd sub nom. Leal v. Sec'y, U.S. Dep't of Health & Human Servs.*, 620 F.3d 1280 (11th Cir. 2010).

Chang also argues that the NPDB Guidelines require that Chang's conduct affect (or may affect) "the health or welfare of *a patient*," ECF No. 18-2 at PageID #98. *See* ECF No. 20 at PageID #106. That is a variation on the requirement under the HCQIA that the conduct may affect "the health or welfare of any individual." 42 U.S.C. § 11112(c)(2). While it is likely that the HCQIA language would control, the reporting of Chang's summary suspension still complies with the NPDB Guidelines' requirement. As discussed above, Chang's behavior was disruptive to a medical staff member, which in turn jeopardized her medical care to *patients*.

Accordingly, the court finds Chang has failed to show a likelihood of success on the merits of challenging the Hospital's reporting of his summary suspension to the NPDB.

### 2. *Violation of the Hospital's Bylaws*

The Medical Staff Bylaws allow summary suspension "[w]henever conduct requires immediate action to be taken to reduce a substantial likelihood of imminent danger to the heath or safety of any patient, *employee* or other person present in the Hospital . . . ." Medical Staff Bylaws ¶ 8.3.1 (emphasis added). Based on the facts found in the independent investigation, there is a substantial likelihood of imminent danger, *at least*, to the employee that was allegedly coerced into non-consensual sexual activities by Chang. Further, the Hospital followed Medical Staff Bylaws by completing the corrective action investigation within 30 days and scheduling a formal hearing to commence within 60 days of Chang's request. *See id.* Nowhere do the Medical Staff Bylaws prohibit reporting to the NPDB. In fact, the Medical Staff Bylaws provide that in an action that constitutes grounds for a formal hearing (like a summary suspension), a practitioner must be notified that "the action[], if adopted, must be reported to the [NPDB]." *See id.* ¶ 9.2.2. Accordingly, Chang's second cause of action has no likelihood of success.

**B.      Likelihood of Suffering Irreparable Harm**

Chang has partly conceded the issue of whether reporting the summary suspension to the NPDB would cause Chang to suffer irreparable harm. In the July 19, 2019 letter to the court from his attorney Eric Seitz, Seitz stated that "[w]e now concede that the initial report [to the NPDB] can be voided, so as to the degree of 'irreparable harm' there now appears to be somewhat less concern." ECF No. 20 at PageID #106. Seitz refers to the fact that the NPDB will void a summary suspension that is overturned as well as send notifications to "all queriers who received the previous version of the report within the past 3 years . . . direct[ing them] to destroy the prior report and any copies of it." ECF No. 18-1 at PageID #92. But Chang later argues in his Reply that voiding the report cannot fully remedy the harm because "'a ringing bell cannot be unrung' once the physician's competence and integrity have been attacked publicly." ECF No. 23 at PageID #142-43 (quoting *Doe v. Cmty. Med. Ctr., Inc.*, 221 P.3d 651, 661 (Mont. 2009)). But even if the court agrees that there is some possibility of harm, *see Doe*, 221 P.3d at 661 ("An erroneous report announcing to all interested parties that a physician is being investigated or suspended for unethical activity or impairment has the potential for immediate harm as well as permanent harm, even

if later retracted."), the court finds little likelihood of irreparable harm given the NPDB's thorough voiding-process.

## C. Balance of Hardships/Equities

Chang provides no substantive arguments on whether the balance of hardships/equities supports issuing an injunction prohibiting the Hospital from reporting to the NPDB. *See* ECF No. 3-10 at PageID #51 (arguing only that "the balance of equities clearly supports the issuance of an injunction in this situation"); *see generally* ECF No. 23.

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). If the Hospital reports Chang's summary suspension to the NPDB, Chang faces hardships such as harm to his reputation and restrictions on his ability to work at other hospitals; however, those hardships are mitigated by the NPDB's voiding process described above. The hardships the Hospital faces are not so clearly defined—essentially, the Hospital will not be allowed to comply with a statutorily-required duty to report the summary suspension. Thus, the court finds that the hardships tip somewhat in

Chang's favor, but they do not tip "sharply" in his favor.  *See Shell Offshore, Inc.*, 709 F.3d at 1291.

## D.     The Public Interest

Chang provides no substantive arguments on the issue of whether the public interest favors issuing an injunction prohibiting the Hospital from reporting to the NPDB.  *See* ECF No. 3-10 at PageID #51 (arguing only that "[t]here is little or no public interest that would support the denial of Chang's application for interim injunctive relief"); *see generally* ECF No. 23.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties."  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22.  The reporting of the summary suspension to the NPDB is in the public interest to prevent Chang from disrupting medical services at other hospitals.  Further, as discussed above, the summary suspension can be overturned after the formal hearing and the report of the suspension can

then be voided by the NPDB. Thus, the impact to the public of losing Chang's services can be minimized if Chang is later exonerated.

Because Chang has not met his burden to establish each *Winter* factor, the Motion must be denied.

## V. CONCLUSION

For the foregoing reasons, the court DENIES Chang's Motion for Preliminary Injunction.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 31, 2019.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Chang v. The Rehabilitation Hosp. of the Pac., et al.*, Civ No. 19-00383 JMS-KJM, Amended Order Denying Motion for Preliminary Injunction, ECF No. 3